1  **HARTLEY LLP**
   Jason S. Hartley
2  101 W. Broadway, Suite 820
   San Diego, California 92101
3  Telephone: (619) 400-5822
4  *hartley@hartleyllp.com*
5
   **STUEVE SIEGEL HANSON LLP**
6  Larkin Walsh
7  Brandi Spates
   Ross Merrill
8  460 Nichols Road, Suite 200
   Kansas City, Missouri 64112
9  Telephone: (816) 714-7100
10 Facsimile: (816) 714-7101
11 *walsh@stuevesiegel.com*
   *spates@stuevesiegel.com*
12 *merrill@stuevesiegel.com*

13         **IN THE UNITED STATES DISTRICT COURT**
           **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
14
15                    **OAKLAND DIVISION**

16 | JEAN PAPPAS, JOHANNAH | Case No. |
17 | HETHERINGTON, NIKOLE DOMKE, MICHELLE | |
   | ANDERSON, and JANE | **CLASS ACTION COMPLAINT** |
18 | ANGELL, individually and on | **FOR:** |
   | behalf of all others similarly | |
19 | situated, | VIOLATIONS OF THE LABOR |
   | | CODE, SECTIONS 970-972, ET |
20 | Plaintiffs, | SEQ., AND COMMON-LAW |
   | | CLAIMS FOR BREACH OF |
21 | v. | CONTRACT, FRAUD, ETC. |
22 | AMN HEALTHCARE SERVICES, | |
   | INC., KAISER FOUNDATION | |
23 | HEALTH PLAN, INC., AND | **JURY TRIAL DEMANDED** |
   | KAISER FOUNDATION | |
24 | HOSPITALS, | |
25 | Defendants. | |

26
27
28

Plaintiffs Jean Pappas, Johannah Hetherington, Nikole Domke, Michelle Anderson, and Jane Angell ("Plaintiffs") assert putative class claims against AMN Healthcare Services, Inc. ("AMN"), as well as Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals ("Kaiser") (collectively, "Defendants") on behalf of themselves and all others similarly situated. Plaintiffs make the following allegations based upon personal knowledge as to their own actions and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1.    Travel nurses serve a valuable role in our nation's healthcare system. Hospitals, clinics, and other healthcare facilities like Kaiser rely on skilled travel employees to fill short-term nursing employment gaps on a temporary basis. To fill these roles, healthcare facilities use intermediary staffing agencies like AMN to employ the travelers, negotiate pay rates, and fill short-term assignments at their facilities. Traveling nurses have played an especially critical role since the start of the COVID-19 pandemic, as many facilities experienced severe staffing shortages that required temporary assistance to continue providing quality healthcare.

2.    But a troubling practice has emerged. In order to maintain the significant profit margins it had become accustomed to during the COVID-19 pandemic and to gain a competitive advantage that will allow it to become the exclusive staffing agency for more hospitals and healthcare providers, AMN is enticing travel nurses to sign with AMN by offering a fixed-term assignment at an attractive agreed-upon pay rate to staff a particular healthcare facility, like Kaiser, which makes up a significant share of AMN's business. Accepting the assignment typically involves the nurse foregoing other employment opportunities, securing short-term housing, relocating within or across states, and incurring related expenses. However, after the nurse accepts the position and starts the assignment, AMN makes a "take-it-or-leave-it" demand to accept less pay or be terminated.

3.     AMN tells its nurses that it is being forced to cut pay rates by its healthcare facility clients, like Kaiser, who AMN blames for unilaterally lowering their "bill rates," *i.e.*, the rate the healthcare facility has agreed to pay AMN.

4.     AMN is knowingly engaging in these "bait-and-switch" practices and perpetrating fraud on travel nurses in a quest for profit and market share.

5.     Of course, most nurses have no choice but to continue working the assignment at the lower rate because they have no reasonable alternatives for comparable employment: they have already incurred travel expenses, secured short-term housing, and uprooted their lives to accept the assignment.

6.     This lawsuit seeks recovery for the pay losses Plaintiffs and other travelers experienced as the result of AMN's unlawful business practices, which AMN blames on the facilities it staffs—like Kaiser facilities. For the reasons set forth below, AMN and Kaiser are jointly and severally liable or share civil liability for payment of wages wrongfully retained, rescinded, or unpaid as asserted herein.

## PARTIES

7.     Plaintiff Jean Pappas is a citizen of Florida who accepted a travel assignment from AMN to relocate and work at a Kaiser facility located in California.

8.     Plaintiff Johannah Hetherington is a citizen of Massachusetts who accepted a travel assignment from AMN to relocate and work at a Kaiser facility located in California.

9.     Plaintiff Nikole Domke is a citizen of Ohio who accepted a travel assignment from AMN to relocate and work at a Kaiser facility located in California.

10.     Plaintiff Michelle Anderson is a citizen of Colorado who accepted a travel assignment from AMN to relocate and work at a Kaiser facility located in California.

11.     Plaintiff Jane Angell is a citizen of Rhode Island who accepted a travel assignment from AMN to relocate and work at a Kaiser facility located in California.

12.     AMN Healthcare Services, Inc. is a public company on the New York Stock Exchange ("NYSE") and is a Delaware corporation with dual-headquarters or principal places of business located at 12400 High Bluff Drive, Suite 100, San Diego, California 92130, and 8840 Cypress Waters Boulevard, Suite 300, Dallas, Texas 75019. AMN does business under numerous brands, including American Mobile, Nursefinders, NurseChoice, HealthSource Global Staffing, Onward Healthcare, O'Grady Peyton International, Med Travelers, Club Staffing, Staff Care, B.E. Smith, Merritt Hawkins, AMN Revenue Cycle Solutions, and AMN Language Services through its wholly owned subsidiaries: Advanced Medical Personnel Services, LLC, AMN Allied Services, LLC, AMN Healthcare, Inc., AMN Healthcare Language Services Inc., AMN Leadership Solutions, Inc., AMN Services, LLC, AMN Staffing Services, LLC, AMN Workforce Solutions, LLC, Avantas, LLC, B4Health, LLC, B. E. Smith Interim Services, LLC, B. E. Smith, LLC, HealthSource Global Staffing, Inc., Medefis, Inc., Merritt, Hawkins & Associates, LLC, Nursefinders, LLC, O'Grady-Peyton International (USA), Inc., ShiftWise, Inc., Silversheet Inc., Spectrum Insurance Company, Inc., Staff Care, Inc., Stratus Video Costa Rica, S.A., and Synzi, LLC.

13.     Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals ("Kaiser") are non-profit corporations incorporated in California with a principal place of business located at One Kaiser Plaza, Oakland, California, 94612.

14.     AMN and Kaiser can be served through their registered agent, CSC – Lawyers Incorporating Service, at 2710 Gateway Oaks Drive, Sacramento, California, 95833.

## **JURISDICTION**

15.     This Court has subject matter jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a proposed class action in which: (1) there are at least 100 class members; (2) the combined claims of

CLASS ACTION COMPLAINT

class members exceed $5,000,000.00, exclusive of interest, attorneys' fees, and costs; and (3) Defendants and at least one class member are citizens of different states.

16.     This Court has personal jurisdiction over AMN and Kaiser as to all claims asserted by Plaintiffs herein because AMN and Kaiser are "at home" in California and are therefore subject to general jurisdiction in this forum.

## VENUE AND DIVISIONAL ASSIGNMENT

17.     Venue is proper in this District under 28 U.S.C. § 1391(b) because this is the District in which Kaiser resides and where Plaintiffs performed work for Defendants, and thus a substantial part of the conduct at issue in this case occurred in this District.

18.     Assignment to the Oakland Division is proper under Civil LR 3-2(c)and (d) because Kaiser is located in Oakland, California, in Alameda County, and a substantial part of the events or omissions giving rise to the claim occurred within this county.

## STATEMENT OF FACTS

### A. AMN's Fraudulent Bait-and-Switch Tactics and Improper Pay Rate Reductions.

19.     AMN claims that "People are at the heart of everything we do."[1] In its 2022 public filings with the United States Securities and Exchange Commission ("SEC"), AMN represents that it is "the leader and innovator in total talent solutions for the healthcare sector in the United States" and that it has "the nation's largest network of quality healthcare professionals."[2] Touting its "COVID-19 response in 2020 and 2021," AMN asserts that "[t]hroughout the pandemic, caring for the well-being of our team members and healthcare professionals has been a primary focus.

---

[1] https://www.amnhealthcare.com/.
[2] https://www.sec.gov/ix?doc=/Archives/edgar/data/0001142750/00011427502200 0010/amn-20211231.htm at 1.

1    We are working hard every day to ensure that all of our team members and healthcare

2    professionals have the resources available to help them navigate the continued

3    challenges and stresses associated with the pandemic."[3] But these statements are

4    inconsistent with AMN's actions, which are geared towards maximizing its profits

5    no matter the impact on its employees.

6        20.    To fill temporary positions, healthcare facilities in need of temporary

7    employees offer staffing agencies like AMN a "bill rate" which is a total amount

8    they are willing to pay the staffing agency for every hour worked by a traveling

9    nurse. The staffing agency then deducts costs, overhead, and profit margin from the

10   bill rate and advertises the hourly rate it is willing to pay a traveling nurse to accept

11   the facility assignment.

12       21.    AMN competes with other staffing agencies who also contract with

13   healthcare facilities to staff open positions. And it competes with these agencies for

14   the talented travel nurses who will fill those roles. As AMN notes in its public filings,

15   "[t]he healthcare staffing and workforce solutions industry is highly competitive."[4]

16   For example, AMN contracts with Kaiser, which comprised approximately 17% of

17   AMN's consolidated revenue in 2021.[5] These relationships, particularly those as

18   significant as AMN's with Kaiser, are critical to AMN's business. As AMN

19   acknowledges, "If we were to lose Kaiser as a client or were unable to provide a

20   significant amount of services to Kaiser, whether directly or as a subcontractor, such

21   loss may have a material adverse effect on our revenue, results of operations and

22

23

24

_____

25   [3] *Id.*

26   [4] *Id.* at 7.

27   [5] *Id.* at 10; *see also id.* at 6 ("No other client healthcare system or single client facility
     comprised more than 5% of our consolidated revenue for the fiscal year ended
28   December 31, 2021.").

cash flows."[6] Indeed, AMN's "business depends upon our ability to maintain our existing contracts and secure new, profitable contracts."[7]

22.     To win contracts and attract nurses away from competitors to fill these roles, AMN advertises attractive pay packages for assignments across the country intended to entice registered nurses to sign on as an employee of AMN and accept a fixed-term assignment: "Our process to attract and retain healthcare professionals . . . depends on . . . creating competitive compensation packages. . . . The attractive compensation package that we provide our temporary healthcare professionals includes a competitive wage, professional development opportunities, professional liability insurance, 401(k) plan and health insurance."[8]

23.     AMN hires a team of "recruiters" whose job is to sell potential traveling nurses on accepting a travel position, and then to serve as the primary point of contact between the employee and agency. AMN "recruit[s] our healthcare professionals, depending on the particular service line, under [more than a dozen different brands.]"[9]

24.     AMN knows that in order to accept these assignments, many nurses must give up their current employment, move to the location of the facility (oftentimes out-of-state), secure short-term housing, and incur other travel and housing-related costs at their own expense.

25.     AMN knows that the process of signing on as an AMN employee and accepting a new travel assignment can take weeks or months of preparation. Among other things, it may require filling out forms, securing licensing, passing a physical, getting vaccinations, taking drug tests, satisfying continuing education requirements, and completing orientations or training modules.

---

[6] *Id*. at 10.
[7] *Id*. at 11.
[8] *Id*. at 6.
[9] *Id*.

CLASS ACTION COMPLAINT

26.   AMN utilizes form employment agreements entitled Professional Services Agreements ("PSAs" or "Agreements") for its traveling nurse employees that include the following material terms:

(1) the start and end date for the assignment,

(2) the facility name and address,

(3) the position, shift, and minimum required hours and shifts, and

(4) the traveler's compensation, set forth as:

(a) an hourly pay rate;

(b) an on-call pay rate;

(c) a call back rate;

(d) a holiday rate; and

(e) the traveler's daily meals, incidentals, and housing stipends.

27.   But AMN's agreements are premised on false promises: AMN does not intend to pay its travel employees the hourly rate that it agreed to pay. AMN bets on the fact that after a nurse has spent weeks or months procuring an assignment—and taking all the steps necessary to accept that assignment, such as procuring housing, moving, and leaving a current employment—it will not be economically feasible for them to walk away from the assignment after AMN unilaterally cuts their pay.

28.   Significantly, nothing in the PSA would indicate to a reasonable person a possibility that its material terms, including the rates of compensation, were subject to unilateral change during the specified duration.

29.   Nor did AMN inform Plaintiffs of the fact that it regularly engaged in a company-wide policy, pattern, and practice of making mid-contract pay rate reductions.

30.   Time and again AMN employees report a similar story: after an employee is committed to an assignment—for example the employee has completed pre-job training or already moved across the country and started the assignment—

an AMN recruiter sends the employee a communication titled "adjusted rate" that asserts that the facility (*e.g.*, Kaiser), not AMN, unexpectedly adjusted its rates due to "census normalization" and "cost savings" in a manner that will require AMN to decrease the employee's pay and/or hours. This message reads as follows:

> Hey [insert name], I have some news to share that is not fun to deliver. But keep in mind, this is still amazing pay and a great result rather than having a cancel [sic] as we move out of a pandemic market. Your facility [insert name] has made the decision to move travelers from [original rate/hours] to [reduced rate/hours] effective [insert date]. This decision was driven by census normalization and cost savings measures to keep the majority of travelers on assignment rather than cancels [sic]. Facility has set a deadline for [insert date] on final decision. If you do not want to proceed on the new pay package[,] this will result in a cancel, effective [insert date].

31.    It is likely that hundreds or thousands of AMN employees have received this communication or ones like it. In almost every instance, AMN blames the rate decrease on the *facility* supposedly changing its bill rate (*i.e.*, the amount AMN is being paid hourly for the employee's work) in response to a lower census.

32.    But even if the facility changes its bill rate with AMN, nothing in AMN's PSAs permit it to pass along those decreases to their unsuspecting employees. After all, *AMN and the employee* agreed upon a set rate of pay that was not in any way dependent on the actions of a third party or AMN making a pre-determined margin.

33.    In instances where AMN's employees refuse to sign a "revised" employment agreement decreasing their pay, AMN simply proceeds with unilateral pay reductions. Hundreds if not thousands of traveling nurses and other healthcare workers employed by AMN have reported experiencing similar "take-it-or-leave-it" pay cuts in the middle of their contracts.

34.    In addition to exploiting an essentially captive workforce, AMN's pervasive fraud also enables it to manipulate competition in the healthcare staffing marketplace. For example, when AMN competes with other staffing agencies to fill a travel position, it advertises higher pay packages that are more likely to entice travel employees, knowing that it does not intend to pay that amount after the employees begin the assignment.

35.    This practice has the perverse effect of not only harming its travel nurses, but also harming competition in the United States travel nurse market: the practice locks up talented travel nurses for an ostensibly competitive rate, denying AMN's competitors from that talent, but then AMN pays those nurses substantially less than it contracted to pay. If employees knew the true compensation AMN was going to pay, they could have chosen employment with another (honest) travel nurse company.

36.    In other instances, AMN positions itself to be the exclusive staffing agency for hospitals and other healthcare providers by marketing its ability to successfully fill positions of need at a lower cost, a value proposition that hinges on its "bait-and-switch" business model. In certain parts of the country, like California, AMN's reach is becoming so great (through use of exclusive contracts and other means) that if a travel employee refuses to complete an assignment at a reduced rate, the employee will be blacklisted from working at facilities in the region.

37.    Nurses employed by AMN across the country report feeling demoralized and taken advantage of by the company's fraudulent pay practices, but fear blacklisting and potential retaliation if they do not complete their assignment.

### 1.  Defendants' Recruitment and Deception of Plaintiff Jean Pappas

38.    On or before March 3, 2022, AMN made an employment offer to Plaintiff Jean Pappas that included a fixed-term travel assignment in San Leandro, California to fulfill Kaiser's purported staffing needs.

39.     At the time, Plaintiff Pappas was working for another travel nurse staffing agency on assignment in Santa Rosa, California and had been offered a 13-week extension to continue working there for a pay package totaling approximately $4,500 per week.

40.     AMN's employment agreement offered her a position at Kaiser – San Leandro – Critical Need in San Leandro, California from April 12, 2022, until July 7, 2022, with the following compensation package: a base hourly pay rate of $100 with a minimum of 48 scheduled hours per week; an overtime hourly pay rate of $150; a holiday hourly pay rate of $150; an hourly call-back rate of $150; a daily meals and incidentals stipend of $50; and a daily housing stipend of $164.38, resulting in a weekly combined stipend of $1,500.66. AMN's offer amounted to a per-week pay package of more than $7,000—substantially more than Plaintiff Pappas' other offer.

41.     In reliance on the foregoing material terms, Plaintiff Pappas accepted AMN's offer of employment by executing AMN's form employment agreement on March 21, 2022.

42.     To comply with her duties under the agreement, Plaintiff Pappas incurred expenses to remain away from her home in Florida, to travel from Santa Rosa, California, to San Leandro, California, secured short-term living arrangements, and gave up other offered employment.

43.     On April 13, 2022, the second day of her agreed-upon 13-week assignment, AMN made Jean Pappas a "take-it-or-leave-it" demand to accept less pay or be terminated. Specifically, AMN demanded that she accept a 35% reduction of her base hourly pay rate from $100 to $65 and corresponding cuts in her overtime, holiday, and call-back hourly pay rates from $150 to $97.50, as well as a reduction in her guaranteed hours from 48 to 36 hours per week, in order to complete the previously agreed-upon assignment. This reduction decreased Plaintiff Pappas'

weekly pay package below $4,500—less than she was making with the agency she left for AMN.

44.    AMN blamed the pay reduction on the hospital. AMN texted Plaintiff Pappas indicating that the hospital determined the pay reduction, based on what its budget allows for low census and rate normalization, and that AMN had no say in what was offered:

> Unfortunately I don't have a say in what was offered. That was determined by the facility as what they could afford. They would love to keep you and all the travelers there, but this is what the budget allows for with how census has been changing and rates normalizing.

45.    Plaintiff Pappas refused to sign the revised agreement. AMN unilaterally cut her pay rate anyway. Having already spent substantial time and money securing the assignment and taking the steps necessary to ensure compliance with her obligations under the agreement, and unable to find comparable employment in such a short period of time, Plaintiff Pappas had no real choice but to continue working the assignment at the lower rate.

46.    Plaintiff Pappas fulfilled her assignment duties until she was forced to stop working for health reasons associated with AMN's bait-and-switch. As a result, Plaintiff Pappas suffered monetary losses. At a minimum, the difference between the value of the original agreement and the unilateral pay reduction was more than $30,000.

**2. Defendants' Recruitment and Deception of Plaintiff Johannah Hetherington**

47. On or before February 24, 2022, AMN made an employment offer to Plaintiff Johannah Hetherington that included a fixed-term travel assignment in Oakland, California, to fulfill Kaiser's purported staffing needs.

48. The employment agreement offered her a position at Kaiser – Oakland Medical Center in Oakland, California from March 14, 2022, until June 11, 2022, with the following compensation package: a base hourly pay rate of $114 with a minimum of 48 scheduled hours per week; an overtime hourly pay rate of $171; a holiday hourly pay rate of $171; an hourly call-back rate of $171; a daily meals and incidentals stipend of $50.00; and a daily housing stipend of $139.73, resulting in a weekly combined stipend of $1,328.11.

49. In reliance on the foregoing material terms, she accepted AMN's offer of employment by executing AMN's form employment agreement on February 24, 2022. To comply with her duties under the agreement, she traveled away from her home in Massachusetts to California, largely at her own expense, secured short-term living arrangements, and gave up other employment opportunities.

50. On April 17, 2022, approximately five weeks through her agreed-upon 13-week assignment, AMN made Johannah Hetherington a "take-it-or-leave-it" demand to accept less pay or be terminated. Specifically, AMN demanded that she accept a more than 50% reduction of her base hourly pay rate, from $114 to $55 and corresponding cuts in her overtime, holiday, and call-back hourly pay rates from $171 to $82.50, as well as a reduction in her guaranteed hours from 48 to 36 hours per week, in order to complete the previously agreed-upon assignment.

51. Plaintiff Hetherington refused to sign the revised agreement. AMN unilaterally cut her pay rate anyway. Having already spent substantial time and money securing the assignment and taking the steps necessary to ensure compliance with her obligations under the agreement, and unable to find comparable

employment in such a short period of time, Plaintiff Hetherington had no real choice but to continue working the assignment at the lower rate. Plaintiff Hetherington never would have moved across the country and accepted the assignment had she known AMN would disregard the parties' agreement and unilaterally cut her pay.

52.     Plaintiff Hetherington completed her assignment in accordance with her duties. As a result, she suffered monetary losses. At a minimum, the difference between the value of the original agreement and the unilateral pay reductions was more than $14,000.

### 3.  Defendants' Recruitment and Deception of Plaintiff Nikole Domke

53.     On or before February 15, 2022, AMN made an employment offer to Plaintiff Nikole Domke that included a fixed-term travel assignment in Modesto, California, to fulfill Kaiser's purported staffing needs.

54.     The employment agreement offered Plaintiff Domke a position at Kaiser – Modesto Medical Center – Critical Need in Modesto, California from March 15, 2022, until June 11, 2022, with the following compensation package: a base hourly pay rate of $110 with a minimum of 36 scheduled hours per week; an overtime hourly pay rate of $165; a holiday hourly pay rate of $165; an hourly call-back rate of $165; a daily meals and incidentals stipend of $50; and a daily housing stipend of $95.34, resulting in a weekly combined stipend of $1,017.38.

55.     In reliance on the foregoing material terms, Plaintiff Domke accepted AMN's offer of employment by executing AMN's form employment agreement. To comply with her duties under the agreement, Plaintiff Domke traveled away from her home in Ohio to California, secured short-term living arrangements, and gave up other employment opportunities.

56.     On or before April 17, 2022, about four weeks into her agreed-upon 13-week assignment, AMN made Plaintiff Domke a "take-it-or-leave-it" demand to accept less pay or be terminated. Specifically, AMN demanded that she accept a

35% reduction of her base hourly pay rate, from $110 to $72, and corresponding cuts in her overtime, holiday, and call-back hourly pay rates from $165 to $108, in order to complete the previously agreed-upon assignment.

57.     Plaintiff Domke refused to sign the revised agreement and AMN terminated her as a result. In addition, AMN refused to pay Plaintiff Domke's completion bonus, even though Plaintiff Domke performed her assignment in accordance with her duties until AMN's termination of the contract. As a result, she suffered monetary losses. At a minimum, the difference between the value of the original agreement and the unilateral pay reductions was more than $10,000.

### 4. Defendants' Recruitment and Deception of Plaintiff Michelle Anderson

58.     On or before March 28, 2022, AMN made an employment offer to Plaintiff Michelle Anderson that included a fixed-term travel assignment in Santa Rosa, California, to fulfill Kaiser's purported staffing needs.

59.     The employment agreement offered Plaintiff Anderson a position at Kaiser – Santa Rosa Medical Center – Critical Need in Santa Rosa, California from April 12, 2022, until July 9, 2022, with the following compensation package: a base hourly pay rate of $94.75 with a minimum of 36 scheduled hours per week; an overtime hourly pay rate of $142.13; a holiday hourly pay rate of $142.13; an hourly call-back rate of $142.13; a daily meals and incidentals stipend of $50; and a daily housing stipend of $147.95, resulting in a weekly combined stipend of $1,385.65.

60.     In reliance on the foregoing material terms, Plaintiff Anderson accepted AMN's offer of employment by executing AMN's form employment agreement. To comply with her duties under the agreement, Plaintiff Anderson traveled away from her home in Colorado to California, secured short-term living arrangements, and gave up other employment opportunities.

61.     On or before April 17, 2022, about five days into her agreed-upon 13-week assignment, AMN made Plaintiff Anderson a "take-it-or-leave-it" demand to

accept less pay or be terminated. Specifically, AMN demanded that she accept a more than 31% reduction of her base hourly pay rate, from $94.75 to $65 and corresponding cuts in her overtime, holiday, and call-back hourly pay rates from $142.13 to $97.50, in order to complete the previously agreed-upon assignment.

62.    Having already spent substantial time and money securing the assignment and taking the steps necessary to ensure compliance with her obligations under the agreement, and unable to find comparable employment in such a short period of time, Plaintiff Anderson had no real choice but continue working at the reduced rate.

63.    Plaintiff Anderson completed her assignment in accordance with her duties. As a result, she suffered monetary losses. At a minimum, the difference between the value of the original agreement and the unilateral pay reductions was more than $14,000.

**5.  Defendants' Recruitment and Deception of Plaintiff Jane Angell**

64.    On or before March 20, 2022, AMN made an employment offer to Plaintiff Jane Angell that included a fixed-term travel assignment in Santa Clara, California, to fulfill Kaiser's purported staffing needs.

65.    The employment agreement offered Plaintiff Angell a position at Kaiser – Santa Clara Medical Center – Critical Need in Santa Clara, California, from April 12, 2022, until July 9, 2022, with the following compensation package: a base hourly pay rate of $100 with a minimum of 48 scheduled hours per week; an overtime hourly pay rate of $150; a holiday hourly pay rate of $150; an hourly call-back rate of $150; a daily meals and incidentals stipend of $50; and a daily housing stipend of $139.73, resulting in a weekly combined stipend of $1,328.11.

66.    In reliance on the foregoing material terms, Plaintiff Angell accepted AMN's offer of employment by executing AMN's form employment agreement. To comply with her duties under the agreement, Plaintiff Angell traveled away from her

home in Rhode Island to California, secured short-term living arrangements, and gave up other employment opportunities.

67.    On April 14, 2022, day two of her agreed-upon 13-week assignment, AMN made Plaintiff Angell a "take-it-or-leave-it" demand to accept less pay or be terminated. Specifically, AMN demanded that she accept a 45% reduction of her base hourly pay rate, from $100 to $55 and corresponding cuts in her overtime, holiday, and call-back hourly pay rates from $150 to $82.50, as well as a reduction in her guaranteed hours from 48 to 36 per week, in order to complete the previously agreed-upon assignment.

68.    Plaintiff Angell refused to sign the revised agreement. Nevertheless, AMN unilaterally cut her pay rate. Having already spent substantial time and money securing the assignment and taking the steps necessary to ensure compliance with her obligations under the agreement, and unable to find comparable employment in such a short period of time, Plaintiff Angell had no real choice but continue working at the reduced rate.

69.    Plaintiff Angell continued working her assignment in accordance with her duties until she put in her notice and completed working accordingly thereafter. As a result of the unilateral rate reduction, she suffered monetary losses. At a minimum, the difference between the value of the original agreement and the unilateral pay reductions was more than $5,000.

**B. AMN Breached the Agreements, Defrauded Plaintiffs, Underpaid Plaintiffs, Engaged in Unfair Business Practices, and Violated Various Provisions of the Labor Code.**

70.    As set forth above, Plaintiffs relied on the material terms of their agreements including: the fixed assignment term, the payment package, and the guaranteed hours or days in accepting their offers. Plaintiffs believed the assignment was worth foregoing other employment, relocating, and incurring the associated professional and personal costs of accepting the travel assignment. In addition,

Plaintiffs relied on the fact the foregoing material terms could not be changed without additional consideration and the reasonable expectation that AMN would act in good faith and fair dealing and honor its promises or representations. Plaintiffs would not have accepted the agreement had they known that AMN would violate the terms and spirit of the agreement.

71.     By making the take-it-or-leave-it demands described above, after Plaintiffs relied on AMN's representations and undertook obligations under their agreements, AMN breached its contracts with Plaintiffs—specifically the promises of employment at a specified rate of pay for a fixed-term assignment. AMN made this take-it-or-leave-it-demand in breach of the express terms of the contracts and implied duty of good faith and fair dealing.

72.     The "revised" agreements that Plaintiffs and other similarly-situated employees were coerced to sign are not enforceable because an effective contract modification or accord requires the exchange of new consideration. As alleged herein, there was no exchange of new consideration because Plaintiffs were compelled to undertake the same obligations for less pay. Consequently, AMN cannot relieve itself of its contractual obligations under one contract by coercing acceptance of a second contract with less favorable terms.

73.     Additionally or alternatively, AMN induced Plaintiffs into entering these agreements based on fraud, omissions, or negligent misrepresentations, as further set forth herein.

74.     IWC Wage Order No. 4-2001 applies to the employment of Plaintiffs and other similarly situated individuals with AMN, and no exemptions apply.

75.     There is no legal justification for AMN's conduct. Even if AMN's client no longer needed as much staff or decided to reduce the bill rate, for example, nothing in the terms of the form agreement authorizes AMN to unilaterally adjust pay rates to account for new circumstances, whether foreseeable or not.

76.     AMN's clients, including Kaiser, played an actionable role in inducing the breach of AMN's agreements with Plaintiffs and interfering with the agreements. Further, because they jointly employed Plaintiffs as client employers or because AMN was acting as their ostensible agent, Kaiser is liable, jointly and severally, for AMN's violations of the California Labor Code resulting in underpayment or nonpayment of wages that were the lawful property of Plaintiffs.

**C. AMN's Relationship with its Clients, Including Kaiser, Who Are Jointly Liable for AMN's Wage Payment Failures.**

77.     Kaiser contracts with nurse staffing agencies like AMN to recruit and employ travel nurses like Plaintiffs and others similarly situated to fill certain staffing needs at Kaiser facilities.

78.     Kaiser and AMN entered into a contract, in which AMN agreed to provide staffing services to Kaiser in exchange for compensation. The specific terms of this contract are in the exclusive control of Kaiser and AMN and unavailable to Plaintiffs, who are not parties to such contract and thus make certain allegations on information and belief.

79.     As a labor contractor, AMN supplies Kaiser with workers like Plaintiffs to perform labor within and on the premises of the Kaiser's facilities to care for patients, as part of the Kaiser facilities' usual course of business. Thus, all Defendants bear legal responsibility and are civilly liable for the proper payment of wages under Cal. Lab. Code § 2810.3.

80.     Plaintiffs have initiated the notice required by § 2810.3(d) by serving on Kaiser a letter dated February 6, 2024, stating their intent to pursue a civil action against AMN and Kaiser pursuant to Cal. Lab. Code § 2810.3(b) and (d), for inter alia, wage payment failures for which Kaiser is jointly and severally liable.

81.     Although Plaintiffs, and others who are similarly situated, signed employment agreements with AMN, on information and belief, AMN employs

Plaintiffs on behalf of or as an agent of Kaiser to staff Kaiser facilities pursuant to Kaiser and AMN's contract, in which:

    a. Kaiser authorizes AMN and AMN agrees to act as Kaiser's agent for the purpose of staffing Kaiser facilities with travel nurses like Plaintiffs.

    b. Kaiser authorizes AMN and AMN agrees to employ travel nurses like Plaintiffs that AMN staffs at Kaiser facilities.

    c. Kaiser controls and AMN agrees Kaiser may control the bill rate—the total amount Kaiser agrees to pay AMN for every hour worked at a Kaiser facility by a travel nurse employed by AMN—and thus the compensation of Plaintiffs.

    d. Kaiser authorizes AMN and AMN agrees to pay travel nurses like Plaintiffs for their work at Kaiser facilities, including the authority to adjust pay mid-contract.

    e. Kaiser maintains and AMN agrees that Kaiser maintains the ultimate authority to terminate or fire travel nurses that AMN staffs at Kaiser facilities, like Plaintiffs.

82. Alternatively, on information and belief, Kaiser is a joint employer of the Plaintiffs who work at Kaiser facilities and is thus liable for its own employment misconduct and jointly and severally liable for AMN's employment misconduct. For example:

    a. Kaiser, as it does it with its own direct or contractual employees, controls and directs the performance of the work of such employees like the Plaintiffs who worked at a Kaiser facility by controlling and directing their scope of work, work orders, shifts, hours, procedures, protocols, charting, entering time, and more. Kaiser's control over each Plaintiff's work is the same as its control over the work of its own direct contractual employees.

b. Kaiser suffers and permits Plaintiffs to work at its facility: Each employee like each Plaintiff who worked at a Kaiser facility performs work that is within the usual course of Kaiser's business, as Kaiser directly employs the same types of employees who in fact work side-by-side with such employees. Kaiser makes no distinctions regarding its control and direction over the work of its own nurses as opposed to AMN-contracted nurses, but treats them the same.

c. On information and belief, the agreement between Kaiser and AMN authorizes Kaiser to exercise other indicia of employment related to AMN-contracted nurses such as Plaintiffs, including the ability to interview, and approve or disapprove them for assignment, i.e., engage them to work. Kaiser has or maintains the ability to terminate employees procured by AMN if they fail to comply with Kaiser's guidelines and protocols.

d. Kaiser requires specific facility-specific training modules to be completed before any employee like Plaintiffs can work at a Kaiser facility, including training regarding compliance with that Kaiser's facility's protocols, logistics, and practices, and Plaintiffs were expected to abide by Kaiser's protocols, logistics, and practices.

e. Each employee, such as each Plaintiff who worked at a Kaiser facility, is dependent on Kaiser, as a matter of economic reality, for their primary employment, typically working more than 36 hours per week at Kaiser facilities, subject to Kaiser's direction, supervision, and control.

**D. Kaiser Controls the Bill Rate and Correlating Pay Rate Deductions.**

83.     As alleged herein, AMN blames its own pay reductions on its client healthcare facilities' reduction of the bill rate. AMN insists its pay reductions stem

from Kaiser's unilateral decisions to cut bill rates, and it is these bill rate reductions that purportedly force AMN to make "take-it-or-leave-it" demands to Plaintiffs and other AMN employees to accept reduced pay or be terminated.

84. Kaiser knows that AMN enters employment contracts with the travel nurses to staff their facilities. Kaiser knows or should know that the pay rate AMN pays Plaintiffs and other travel nurses depends on Kaiser's bill rate, such that Kaiser knows or should know that reducing the bill rate affects the pay rate that Plaintiffs and other AMN employees receive for services rendered.

85. On information and belief, nothing in the agreements between AMN and Kaiser authorizes or permits or contemplates Kaiser to engage in reductions of the agreed-upon bill rate.

**E. AMN's Arbitration Agreement is Unconscionable and thus Unenforceable.**

86. Into each of its PSAs with Plaintiffs, AMN embedded a clause titled "Arbitration of Disputes." This clause purports to require the company and the employee to resolve in arbitration "all claims (common law or statutory) . . . including but not limited to all claims relating in any way to Professional's employment by the Company, or any past or future employment of Professional by the Company."

87. As to the PSAs, AMN is in a position of superior bargaining power because the PSAs are not negotiated at arm's length with individual travel nurses. Rather, they are drafted by AMN, offered on a take-it-or-leave-it basis, and travel nurses have no meaningful choice in deciding whether to agree. Instead, they must agree to the embedded arbitration clause as a mandatory condition of their employment with the company.

88. Notably, although Plaintiffs' employment is informed by a nearly 80-page handbook, which is incorporated by reference in the PSA, there is nothing in

the handbook that would indicate that disputes will be handled by individual arbitration in which the prevailing party is entitled to its fees and costs. Instead, the arbitration provision first appears in the PSA, which offers the assignment, the dates, the payrates, and as to which there is an urgency to sign or lose the opportunity. The PSA indicates that the nurse "accepts" all the PSA terms by commencing work, whether or not the travel nurse actually signs the agreement.

89.   In substance, AMN's arbitration agreement does the following:

a.   It requires a travel nurse to waive the right to "initiate, participate in, or recover through, a class or collective action," without any exemption.

b.   As to costs and fees, AMN's arbitration agreement provides that "to the maximum extent permitted by law, the arbitrator shall award the prevailing party its costs and reasonable attorney's fees . . . provided, however, that the arbitrator at all times shall apply the law for the shifting of costs and fees that a court would apply to the claim(s) asserted."

c.   This "loser pays"  provision is unconscionable as it provides  that an employee would be liable *for AMN's attorney's fees and costs* if he or she does not prevail on her claim.

d.   Compounding this, at the time AMN required that Plaintiffs and other travel nurses sign the agreement as a condition of their employment, neither Plaintiffs, nor any layperson, would have been able to decipher what the "law for the shifting of costs and fees" would be on any potential claims the nurse may have against the company.

e.   The agreement's indecipherable reference to "law for the shifting of costs and fees" is thus aimed to obfuscate rather than clarify what the travel nurse is consenting to.

f.  Travel nurses facing a "loser pays" provision are significantly less likely to exercise their statutory rights or otherwise initiate a dispute.

90.  The provision specifies that "a court of competent jurisdiction (and not an arbitrator) shall resolve any dispute about the formation, validity, or enforceability of any provision of this Agreement."

91.  The PSA, by its terms, contains no severability clause.

## **CLASS ACTION ALLEGATIONS**

92.  <u>Class Definitions</u>: Plaintiffs bring this action individually and on behalf of other similarly situated individuals. Pursuant to Federal Rules of Civil Procedure 23(b)(3), 23(b)(2), and/or 23(c)(4), Plaintiffs seek certification of the classes and subclasses defined as follows:

> <u>The Class</u>: All persons who entered into an agreement with AMN to work at a healthcare facility and whose total compensation was reduced before the end of the agreed upon term.

> <u>The Kaiser Subclass</u>: All persons who entered into an agreement with AMN to work at a Kaiser healthcare facility and whose total compensation was reduced before the end of the agreed upon term.

> <u>The California § 970 Subclass</u>: All persons who entered into an agreement with AMN to work at a healthcare facility and who traveled into, out of, or within California for purposes of that assignment and whose total compensation was reduced before the end of the agreed upon term.

93.  Excluded from the Class are the Court and its officers, employees, and relatives; AMN and its subsidiaries, officers, and directors; and governmental entities.

94.  <u>Numerosity</u>: the Class consists of members so numerous and geographically dispersed that joinder of all members is impracticable, as AMN employs thousands of similarly situated individuals across the United States.

95.     All members of the Class are ascertainable by reference to objective criteria, as AMN has access to addresses and other contact information for class members that can be used for notice purposes.

96.     <u>Common Questions of Law and Fact Predominate</u>: There are many questions of law and fact common to Plaintiffs and the Class, and those questions substantially predominate over any questions that may affect individual members of the Class. Common questions include:

     a.  Did AMN make actionable misrepresentations or omissions?

     b.  Were AMN's promises, representations, or omissions false or misleading?

     c.  Did AMN intend for Plaintiffs and the Class to rely on its promises, representations, or omissions?

     d.  Should AMN have known that such promises or representations would cause justifiable or reasonable reliance?

     e.  Did AMN owe a duty to Plaintiffs and the Class to not conceal the truth?

     f.  Did AMN's conduct in reducing compensation packages breach the travel assignment agreements?

     g.  Did AMN act in bad faith?

     h.  Did AMN engage in fraudulent concealment?

     i.  Did AMN's conduct violate the Labor Code or common law?

     j.  Is AMN's bait-and-switch business practice unfair, deceptive, or fraudulent under the Labor Code?

     k.  Is AMN's form arbitration agreement unconscionable?

     l.  Does Kaiser jointly employ Plaintiffs?

     m. Does AMN employ Plaintiffs and the Class on behalf of or as an agent of Kaiser?

n.  Is Kaiser a "client employer" pursuant to Cal. Lab. Code § 2810.3?

o.  By cutting its bill rates, did Kaiser wrongfully interfere with Plaintiffs' agreements with AMN or business expectations?

p.  By cutting its bill rates, did Kaiser wrongfully induce a breach of Plaintiffs' agreements with AMN?

97.  Typicality: Plaintiffs' claims are typical of other members of the Class because all of the claims arise from the same course of conduct by AMN and Kaiser, and are based on the same legal theories.

98.  Adequacy of Representation: Plaintiffs are adequate class representatives because their interests do not conflict with the interests of the Class members whom they seek to represent. Plaintiffs have retained counsel with substantial experience in prosecuting complex and class action litigation. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of Class members and have the financial resources to do so. The Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

99.  Superiority of Class Action: Class treatment is superior to individual treatment, as it will permit a large number of similarly situated persons to prosecute their respective class claims in a single forum, simultaneously, efficiently, and without unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce.

100.  To the extent not all issues or claims, including the amount of damages, can be resolved on a class-wide basis, Plaintiffs invoke Federal Rule of Civil Procedure 23(c)(4), reserving the right to seek certification of a class action with respect to particular issues, and Federal Rule of Civil Procedure 23(c)(5), reserving the right to divide the class into subclasses.[10]

_____

[10] Plaintiffs, on behalf of a putative class, previously agreed with AMN on tolling the statutes of limitation applicable to the claims herein.

# COUNT I

# BREACH OF CONTRACT

*On Behalf of Plaintiffs, the Class, and the Kaiser Subclass*

*Against AMN and Kaiser*

101.   Plaintiffs hereby repeat, reiterate, and incorporate by reference each of the foregoing allegations with the same force and effect as if set forth herein and assert this claim in the alternative to their fraud claims to the extent necessary.

102.   AMN offered Plaintiffs and class members employment by certain written terms in the agreement.

103.   As consideration for their agreement, AMN agreed, among other things, to employ, pay, and provide certain benefits to Plaintiffs and class members under their respective agreements; and Plaintiffs and class members agreed, among other things, to undertake certain obligations.

104.   The parties mutually assented to the agreement.

105.   Plaintiffs and class members accepted AMN's offer of employment on the terms therein by executing the agreement.

106.   Plaintiffs and class members performed all or substantially all of their obligations under the agreement.

107.   After the parties entered the agreement, AMN materially breached the agreement by failing to pay Plaintiffs and class members the amounts they promised.

108.   Before the breaches, all conditions precedent had been fulfilled.

109.   Plaintiffs' and class members' damages would not have occurred but for AMN's breaches, which proximately caused Plaintiffs' and class members' damages.

110.   Following the breaches, Plaintiffs and class members made all reasonable efforts to mitigate resulting damages.

111.   Plaintiffs' and class members' damages include the difference in compensation agreed to under the agreement and the actual compensation Plaintiffs and class members received, as well as the costs, expenses, and losses Plaintiffs and class members incurred as a natural and foreseeable result or consequence of AMN's breaches of the contracts.

112.   As alleged herein, Kaiser is liable for the foregoing actions of their agent AMN, who Kaiser authorized to act on its behalf. Kaiser authorized AMN to hire Plaintiffs and the class members on certain terms set forth in their assignment agreement, and Kaiser authorized AMN to reduce the pay rates of Plaintiffs and class members at Kaiser facilities through their agreements with AMN and/or by lowering the bill rate and in turn directing or permitting or causing AMN's rate reductions.

113.   Due to AMN's representations to Plaintiffs and class members—and/or the relationship or agreement between AMN and Kaiser—Plaintiffs and class members reasonably believed AMN was authorized or directed by Kaiser to impose a pay rate cut.

114.   Plaintiffs and class members reasonably believed AMN's representations and its authority to impose rate reductions as Kaiser's actual or ostensible agent, thus Kaiser is liable for damages sustained by Plaintiffs and class members on an ostensible agent theory.

115.   Additionally or alternatively, as alleged herein, as a client employer obtaining labor outsourced from AMN, Kaiser shares civil liability with AMN for the underpayment of wages resulting from the breached contracts.

**COUNT II**

**BREACH OF CONTRACTUAL DUTY**

**OF GOOD FAITH AND FAIR DEALING**

*On Behalf of Plaintiffs and the Class Against AMN*

116.   Plaintiffs hereby repeat, reiterate, and incorporate by reference each of the foregoing allegations with the same force and effect as if set forth herein.

117.   In making take-it-or-leave-it pay reductions under circumstances where AMN knew Plaintiffs and class members would have no choice but to continue working despite making less pay than they bargained for, AMN also deliberately breached the implied covenant of good faith and fair dealing inherent in the parties' agreements.

118.   In failing to inform Plaintiffs and class members of the possibility or likelihood that the material terms of the agreement, including compensation, would be subject to unilateral change, AMN deliberately breached the implied covenant of good faith and fair dealing inherent in the parties' agreements.

119.   Plaintiffs' and class members' damages would not have occurred but for AMN's breaches, which proximately caused Plaintiffs' and class members' damages.

**COUNT III**

**PROMISSORY ESTOPPEL**

*On Behalf of Plaintiffs and the Class Against AMN*

120.   Plaintiffs hereby repeat, reiterate, and incorporate by reference each of the foregoing allegations with the same force and effect as if set forth herein and assert this claim in the alternative to their contract claims to the extent necessary.

121.   AMN made clear and unambiguous promises to Plaintiffs and class members regarding their pay rates that it knew or should have known would induce Plaintiffs and class members to enter into employment agreements with AMN and

1  incur certain expenses, costs, and losses associated with that employment, including
2  but not limited to relocation and housing.

3      122.   Plaintiffs and class members reasonably relied on such promises in
4  entering into employment agreements, relocating, and incurring certain expenses,
5  costs, and losses.

6      123.   AMN did not intend to perform its promises when those promises were
7  made and in fact did not perform them.

8      124.   AMN knew and intended for Plaintiffs and class members to rely on
9  these promises, and Plaintiffs' and class members' reliance on these promises was
10 foreseeable to AMN.

11     125.   AMN's promises in fact induced Plaintiffs and class members to enter
12 into employment agreements, relocate, and incur certain expenses, costs, and losses.

13     126.   It would be unjust to allow AMN to profit from making such inducing
14 promises and not fulfilling them.

15     127.   This injustice can only be avoided by forcing AMN to fulfill these
16 promises.

17                 **<u>COUNT IV</u>**

18      **<u>QUANTUM MERUIT / QUASI-CONTRACT</u>**

19      *<u>On Behalf of Plaintiffs, the Class, and the Kaiser Subclass</u>*

20               *<u>Against AMN and Kaiser</u>*

21     128.   Plaintiffs hereby repeat, reiterate, and incorporate by reference each of
22 the foregoing allegations with the same force and effect as if set forth herein and
23 assert this claim in the alternative to their contract claims to the extent necessary.

24     129.   Plaintiffs and class members conferred a benefit upon AMN and Kaiser
25 by filling open healthcare positions that permitted Kaiser to operate and generate
26 revenue as a healthcare provider and AMN to profit as an intermediary staffing
27 agency.

28

130.   AMN and Kaiser appreciated and had knowledge of the benefit Plaintiffs and class members conferred on them.

131.   Kaiser, by reducing the bill rate it was willing to pay AMN for Plaintiffs' and class members' labor and causing AMN to cut the pay rates of Plaintiffs and the class members, kept money that was contractually promised to Plaintiffs and class members.

132.   AMN, by making take-it-or-leave-it demands to reduce Plaintiffs' and class members' pay rates and total compensation in the middle of their contractual terms, and Kaiser, by reducing bill rates mid-contract, kept money that was contractually promised to Plaintiffs and class members.

133.   AMN and Kaiser therefore received, accepted, and retained benefits under circumstances that make it inequitable and unjust for AMN and Kaiser to retain such benefits without payment of their value.

134.   Under the circumstances, AMN and Kaiser should in justice and fairness be compelled to give their benefits to Plaintiffs and class members.

## **COUNT V**

## **FRAUDULENT INDUCEMENT**

### *On Behalf of Plaintiffs and the Class Against AMN*

135.   Plaintiffs hereby repeat, reiterate, and incorporate by reference each of the foregoing allegations with the same force and effect as if set forth herein and assert this claim in the alternative to their contract claims to the extent necessary.

136.   In order to induce Plaintiffs and class members to work for AMN as travel nurses in a location other than their home, AMN intentionally made material representations of fact as to Plaintiffs and class members about their pay rates and total compensation.

137.   At the time it made these representations, AMN knew that these representations about pay rates and total compensation were false, and that AMN

would ultimately pay Plaintiffs and class members less than the amounts AMN promised.

138.   At the time it made such representations, AMN knew Plaintiffs and class members would reasonably and justifiably rely on its representations—and Plaintiffs and class members did, in fact, justifiably rely on AMN's representations, in entering into their travel assignment agreements, relocating, and incurring certain expenses, costs, and losses.

139.   AMN had superior knowledge that was not reasonably available to Plaintiffs and class members when they entered their travel assignment agreements; AMN knew—but Plaintiffs and class members did not—that AMN had a policy, pattern, and practice of enticing travel nurses to commit to an AMN assignment by presenting attractive pay packages and then cutting the promised rates once the travel nurse had entered the agreement, relocated, and incurred certain expenses, costs, and losses.

140.   AMN had a duty to disclose to Plaintiffs and class members that its representations regarding pay rate and total compensation were false or misleading because, as their prospective employer, there existed a relation of trust and confidence between them, and disclosure was necessary to prevent Plaintiffs and class members from being misled or mistaken.

141.   AMN's misrepresentations were made with the purpose to defraud Plaintiffs and class members.

142.   Plaintiffs and class members did not know AMN's representations regarding their pay rate were false or misleading and had a right to rely on and reasonably relied on them in entering into travel assignment agreements, relocating, and incurring certain expenses, costs, and losses.

143.   As a result of and in reliance upon AMN's fraudulent inducement, Plaintiffs and class members sustained damages as described herein.

1
2
3

# COUNT VI

# FRAUDULENT CONCEALMENT

## *On Behalf of Plaintiffs and the Class Against AMN*

4    144.   Plaintiffs hereby repeat, reiterate, and incorporate by reference each of
5    the foregoing allegations with the same force and effect as if set forth herein and
6    assert this claim in the alternative to their contract claims to the extent necessary.

7    145.   As their prospective employer, AMN owed Plaintiffs and class
8    members a duty to disclose its true plan for the travel nurse assignments, specifically
9    the fact that AMN could and would unilaterally reduce their agreed-upon pay rates
10   or total compensation after Plaintiffs and class members accepted a position that
11   required relocating, and incurring certain expenses, costs, and losses.

12   146.   AMN intended to defraud or deceive Plaintiffs and class members and
13   intentionally failed to disclose the fact that AMN could and would unilaterally
14   reduce pay rates or total compensation after they accepted a position that required
15   relocating and incurring certain expenses, costs, and losses.

16   147.   Plaintiffs and the class members did not know that AMN could and
17   would unilaterally reduce their pay rates or total compensation after they accepted a
18   position that required relocating and incurring certain expenses, costs, and losses.

19   148.   AMN's promises to pay the offered and contracted-for rates for the
20   duration of the assignment were integral to Plaintiffs' and class members' decisions
21   to accept AMN's travel nurse assignment.

22   149.   Plaintiffs and class members justifiably relied on AMN's fraudulent
23   concealment by entering into employment agreements, relocating, and incurring
24   certain expenses, costs, and losses.

25   150.   Had Plaintiffs and class members known AMN's plan to materially
26   alter the pay rates and total compensation promised in its agreements, Plaintiffs and

27
28

CLASS ACTION COMPLAINT

1   class members would not have entered the agreements, relocated, and incurred

2   expenses, costs, and losses.

3       151.   As a result of AMN's fraudulent concealment, Plaintiffs and class

4   members sustained damages as described herein, which were substantially caused

5   by AMN's fraudulent concealment.

6                            **COUNT VII**

7                  **NEGLIGENT MISREPRESENTATION**

8                  *By Plaintiffs and the Class Against AMN*

9       152.   Plaintiffs hereby repeat, reiterate, and incorporate by reference each of

10  the foregoing allegations with the same force and effect as if set forth herein and

11  assert this claim in the alternative to their contract claims to the extent necessary.

12      153.   As their prospective employer, AMN owed Plaintiffs and class

13  members a duty of reasonable care to not make false or misleading statements

14  regarding their employment.

15      154.   AMN owed Plaintiffs and class members a duty to disclose its true plan

16  for the travel nurse assignments, specifically the fact that AMN could and would

17  unilaterally reduce their agreed-upon pay rates or total compensation after Plaintiffs

18  and class members accepted a position that required relocating, and incurring certain

19  expenses, costs, and losses.

20      155.   AMN knew, should have known, or recklessly disregarded that it was

21  unlikely to actually pay the promised pay rate or total compensation for the duration

22  of the assignment.

23      156.   AMN knew, should have known, or recklessly disregarded that its

24  representations to Plaintiffs and class members regarding their pay rates and overall

25  compensation reflected in the travel assignment agreements were false or

26  misleading, because it was reasonably foreseeable that AMN would make a "take-

27

28

it-or-leave-it" demand to accept less compensation or be terminated after acceptance of the initial offer, as was its policy, pattern, and practice.

157.   Plaintiffs and the class members did not know that AMN could and would unilaterally reduce their pay rates or total compensation after they accepted a position that required relocating and incurring certain expenses, costs, and losses.

158.   AMN's promises to pay the offered and contracted for rates for the duration of the assignment were integral to Plaintiffs' and class members' decisions to accept AMN's travel nurse assignment.

159.   AMN intended for Plaintiffs and class members to act on the false or misleading statements.

160.   AMN knew or should have known that Plaintiffs and class members would rely on the false or misleading statements.

161.   Plaintiffs and class members justifiably relied on AMN's misrepresentations and omissions by entering into employment agreements, relocating, and incurring certain expenses, costs, and losses.

162.   Had Plaintiffs and class members known AMN's plan to materially alter the pay rates and total compensation promised in its agreements, Plaintiffs and class members would not have entered the agreements, relocated, and incurred expenses, costs, and losses.

163.   AMN breached its duty of reasonable care by making the false or misleading statements of past or existing material facts which it did not have reasonable grounds to believe to be true, and thus failed to act as a reasonably prudent person would have under the same or similar circumstances by not making those statements.

164.   Plaintiffs and class members were unaware of the truth with respect to AMN's employment practices, and justifiably relied on AMN's negligent

misrepresentations by entering into employment agreements, relocating, and incurring certain expenses, costs, and losses.

165.   As a result of AMN's negligent misrepresentations, Plaintiffs and class members sustained damages as described herein, which were substantially caused by AMN's misrepresentations.

## **COUNT VIII**

### **INDUCING BREACH OF CONTRACT**

*On Behalf of Plaintiffs and the Kaiser Subclass Against Kaiser*

166.   Plaintiffs hereby repeat, reiterate, and incorporate by reference each of the foregoing allegations with the same force and effect as if set forth herein.

167.   A valid contract generally in the form of the PSA existed between Plaintiffs and class members, in which AMN guaranteed work for a specified duration at a specified facility for specified rates of pay.

168.   Kaiser knew of the agreements, as Kaiser requested that AMN secure them by recruiting Plaintiffs and class members to enter into them to work at Kaiser facilities, as reflected in the contracts between and among these parties.

169.   Kaiser intentionally engaged in a breach of its own contracts with AMN by unilaterally lowering its "bill rates." This conduct induced AMN to breach its agreements with the Plaintiffs and class members, by in turn reducing Plaintiffs' and class members' pay rates in violation of the PSAs.

170.   Kaiser intended to induce AMN's breach of its assignment agreements with Plaintiffs and class members or knew that its conduct was substantially likely to induce AMN to breach its agreements with Plaintiffs and class members, as Kaiser's intent in wrongfully reducing their bill rates was to cut costs and pay a lower rate for travel nurses supplied by AMN.

171.   As alleged herein, the PSAs between AMN and the Plaintiffs and class members were breached as a result of the Kaiser's misconduct, and Plaintiffs and class members sustained damages that were substantially caused by this misconduct.

## COUNT IX

## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

### *On Behalf of Plaintiffs and the Kaiser Subclass Against Kaiser*

172.   Plaintiffs hereby repeat, reiterate, and incorporate by reference each of the foregoing allegations with the same force and effect as if set forth herein.

173.   Kaiser intentionally interfered with the PSAs between AMN and Plaintiffs and class members.

174.   Kaiser knew of the agreements, as Kaiser requested that AMN secure them by recruiting Plaintiffs and class members to enter into them to work at Kaiser facilities.

175.   Kaiser's conduct prevented performance of the PSAs or made performance more difficult, in that Kaiser unilaterally reduced their bill rates, which caused AMN to pass those bill rate reductions on to Plaintiffs and class members.

176.   Kaiser intended to disrupt the performance of these agreements or knew that disruption of performance was certain or substantially certain to occur.

177.   There is no justification or authorization for Kaiser's unilateral and harmful mid-contract bill rate reductions.

178.   Plaintiffs and class members were harmed by Kaiser's interference, as their rates were reduced or their assignment agreements were terminated as a result of Kaiser's conduct.

179.   Kaiser's conduct was a substantial factor in causing Plaintiffs' and class members' harm.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT X

## VIOLATION OF CALIFORNIA LABOR CODE § 970

### *By Plaintiffs and the California § 970 Class Against AMN*

180.   Plaintiffs hereby repeat, reiterate, and incorporate by reference each of the foregoing allegations with the same force and effect as if set forth herein.

181.   California Labor Code § 970 prohibits employers from influencing or persuading an employee to relocate from one place to another for work, by means of knowingly false misrepresentations regarding, among other things, the kind, character, or existence of such work; the length of time such work will last; or the compensation therefor. Cal. Lab. Code § 970.

182.   AMN made representations to Plaintiffs and class members concerning the kind or character of the work, the length of time the work would last, and the compensation therefor.

183.   AMN's representations were false, for the reasons alleged herein.

184.   AMN knew when the representations were made that they were false.

185.   AMN intended that Plaintiffs and class members would rely on its false representations.

186.   Plaintiffs and class members reasonably relied on AMN's false representations and relocated for the purpose of working for AMN.

187.   AMN then materially and unilaterally changed the kind and character and compensation of the work, resulting in damage to Plaintiffs and class members.

188.   As a result of AMN's misrepresentations, Plaintiffs and class members were harmed, and their reliance on the AMN's representations was a substantial factor in causing such harm.

189.   Plaintiffs and class members are entitled to automatic double damages for § 970 violations under Cal. Lab. Code § 972.

# COUNT XI

# VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW

# CAL. BUS. & PROF. CODE § 17200

### *By Plaintiffs and the Class Against AMN*

190.   Plaintiffs hereby repeat, reiterate, and incorporate by reference each of the foregoing allegations with the same force and effect as if set forth herein.

191.   The California Unfair Competition Law prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200, *et seq.*

192.   AMN is a "person" as defined by Cal. Bus. Code §17201.

193.   AMN has engaged in unlawful, unfair, and deceptive business acts and practices that, as alleged above, violate Business and Professions Code section 17200.

**Unlawful**

194.   AMN's has engaged in unlawful business practices in that its systematic breaches of contract and its pattern, practice, and policy of defrauding its travel nurses violates multiple laws, including California Labor Code § 970, and common law and the other statutes and regulations alleged herein.

**Unfair**

195.   AMN's business practices, as alleged herein, violate the "unfair" prong of the Unfair Competition Law because they resulted in Plaintiffs and class members being misled and denied wages that AMN promised pursuant to their binding employment agreements. Further, said business practices offend established public policy and are immoral, unethical, and unscrupulous or substantially injurious to employees, as well as to the healthcare industry.

196.   Any reasons, justifications, or motives that AMN may offer for the practices described herein are outweighed by the gravity of harm to the victims. The

1  injuries suffered by Plaintiffs and class members are substantial and are not

2  outweighed by any countervailing benefits to consumers or competition.

3  **Fraudulent**

4  197.   AMN's conduct, as described herein, is fraudulent because it is likely

5  to deceive members of the public.

6  198.   AMN's bait-and-switch tactics were indeed calculated to deceive—and

7  in fact did deceive—Plaintiffs and class members into accepting travel nursing

8  assignments at a promised rate of pay, only to have that promised rate reduced after

9  they had undertaken obligations under the agreement.

10  199.   Plaintiffs and class members have standing to pursue this cause of

11  action because they suffered injury in fact and lost money as a result of AMN's

12  misconduct described herein.

13  200.   Furthermore, Plaintiffs and class members seek payment, as restitution,

14  from AMN of property unlawfully retained or rescinded by AMN's unfair, unlawful,

15  and fraudulent business practices; declaratory relief; reasonable attorneys' fees and

16  costs under California Code of Civil Procedure § 1021.5. Plaintiffs and class

17  members also seek public injunctive relief prohibiting AMN from engaging in the

18  unlawful, unfair, and/or fraudulent conduct alleged herein.

19  201.   As Plaintiffs' and class members' joint employer and a client employer

20  under Cal. Lab. Code § 2810.3, Kaiser is jointly and severally liable or shares civil

21  liability for payment of wages wrongfully retained, rescinded, or unpaid as asserted

22  herein.

23  **REQUEST FOR RELIEF**

24  Plaintiffs, individually and on behalf of all others similarly situated,

25  respectfully request that the Court enter judgment in their favor and against

26  Defendants as follows:

27

28

A.     That the Court certify this action as a class action, proper and maintainable pursuant to Fed. R. Civ. P. 23; declare that Plaintiffs are proper class representatives, and appoint Plaintiffs' counsel as Class Counsel;

B.     That the Court award Plaintiffs and the class(es) or subclass(es) compensatory, consequential, general, nominal, statutory, and punitive damages (along with any other damages available at law) to the extent permitted by law and in an amount to be determined at trial;

C.     That the Court disgorge any unjust enrichment or revenue Defendant gained from its unjust business practices, including the practice of making mid-contract take-it-or-leave-it demands without fair and just compensation, and order payment, as restitution, of all monies so withheld; and

D.     That the Court award reasonable attorneys' fees, costs, and expenses pursuant to Labor Code § 218.5, § 2699(g)(1), Civil Code § 1021.5, and as otherwise provided by law;

E.     That the Court award pre-and post-judgment interest at the maximum legal rate;

F.     That the Court grant all such other relief as it deems just and proper.

## **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs demand a jury trial on all claims so triable.

Dated: March 8, 2024                    Respectfully submitted:


                                        */s/Jason S. Hartley*
                                        **HARTLEY LLP**
                                        Jason S. Hartley
                                        101 W. Broadway, Suite 820
                                        San Diego, California 92101
                                        Telephone: (619) 400-5822
                                        *hartley@hartleyllp.com*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**STUEVE SIEGEL HANSON LLP**
Larkin Walsh
Brandi Spates
Ross Merrill
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
Facsimile: (816) 714-7101
*walsh@stuevesiegel.com*
*spates@stuevesiegel.com*
*merrill@stuevesiegel.com*

***Attorneys for Plaintiffs***
***and the Putative Class***

CLASS ACTION COMPLAINT